IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 13 CR 00685-2 |
| ) | |
| BANIO KOROMA, ) | Judge John J. Tharp, Jr. |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Banio Koroma was charged with two counts of health care fraud, in violation of 18 U.S.C. § 1347, and with two counts of making a false statement in a health care matter,[1] in violation of 18 U.S.C. § 1035. After his co-defendant, Dike Ajiri, pled guilty to related charges, Koroma proceeded to a four-day jury trial, at the end of which the jury returned a verdict of guilty on all counts. Koroma made an oral motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, *see* Trial Tr. Vol. 3 528-29, ECF No. 122, which the Court took under advisement, and now also moves for a new trial under Rule 33. ECF No. 130. For the following reasons, both motions are denied.

### BACKGROUND

Koroma is a medical doctor who identified geriatric medicine as his primary specialty on his Medicare provider enrollment form. He served as the medical director of Mobile Doctors, a company that worked with home health companies and skilled nursing agencies to provide in-

---

[1] Koroma was originally charged with three counts of each violation, but the government dismissed one count of each, both in reference to the same patient ("Patient CW"), prior to trial. *See* Resp. 1, ECF No. 137; *see also* Order, ECF No. 108 (granting government's oral motion to dismiss Counts 9 and 11 of the indictment). The counts upon which the jury convicted Koroma pertain to Patient SM and Patient JC.

home medical services to patients who were unable to leave their homes. The charges accused Koroma of certifying that patients required in-home skilled nursing services when those services were not necessary and of signing and submitting home health certification forms ("Form 485s") to Medicare for payment for those unnecessary services.

At trial, the government admitted into evidence excerpts from chapter seven of the Medicare Benefit Policy Manual ("Manual") pertaining to the conditions a patient must meet in order to be certified for home health services. *See* Gov. Trial Ex. 92; *see also* Trial Tr. Vol. 3 425-27. To qualify for Medicare home health benefits, a patient must "be confined to the home." Trial Tr. Vol. 3 428:8. The Manual explains that "confined to the home" means that the patient is not necessarily bedridden but that he or she has a "normal inability to leave home and [ ] leaving home would require a considerable and taxing effort." *Id*. 429:15-20. A patient who is able to leave the home periodically may still be considered homebound "if the absences from the home are infrequent or for periods of relatively short duration and are attributable to the need [ ] to receive healthcare treatment"—such as kidney dialysis or outpatient chemotherapy or radiation. *Id*. 430:7-16. Leaving the home for religious services or to visit the barber or for other similarly short absences would not negate a finding that the patient is homebound, so long as the absences "do not indicate that the patient has the capacity to obtain healthcare provided outside rather than in the home." *Id*. 431:1-17. The Manual explains that an aged person who does not leave the home frequently "because of feebleness or insecurity brought on by advanced age" does not qualify as confined to the home for the purposes of receiving home health services. *Id*. 433:23–434:2.

To determine whether a patient qualifies for home health services under Medicare regulations, a physician must determine that the services are "reasonable and necessary" based

on the patient's condition at the time services are ordered. *Id*. 440:5-10. The Manual explains that home health services are covered where observation and assessment of the patient "will result in changes to the treatment of the patient." *Id*. 444:16-19. Medicare will not cover home health care services where the patient's illness is "part of a long-standing pattern of the patient's condition and there is no attempt to change the treatment to resolve [it]." *Id*. 444:21–445:1. Through Agent Alex Payne, an FBI agent on the health care fraud squad, the government introduced a series of certification and recertification claims Koroma signed that were submitted to Medicare. *See* Gov. Exs. 24 (for Patient JC), 35 (for Patient SM), 43 (for Patient FP), 63 (for Patient IH). The claims data showed a pattern whereby Koroma certified the patient for home health services for a period of time, then discharged the patient from services after a few months (or failed to recertify the patient), then recertified the patient for home health services despite notations indicating that the patient's medical condition had not changed across the various periods of certification and discharge.

For example, Koroma first saw Patient IH on November 12, 2012. According to her file, however, Koroma ordered home health care services on March 20, 2012, certifying her for services from May 19, 2012 through July 17, 2012; no doctor from Mobile Doctors visited Patient IH during that period. Koroma ordered home health services for this patient again on September 20, 2012, certifying her from November 19, 2012 through January 17, 2013, yet he still had not seen Patient IH at the time he recertified her for home health care services. Although Koroma had not seen the patient, her file contains a "face-to-face encounter" form from another doctor at Mobile Doctors (Dr. Burak Gezen) indicating that he met with the patient on October 11, 2012. Dr. Gezen wrote, "Patient is in stable condition, does not qualify for nursing." Trial Tr. Vol. 2 152:14-15, ECF No. 121; *see also* Gov. Trial Ex. 61.

For Patient SM (one of the patients charged in the indictment), Koroma submitted Form 485s certifying her for home health services from March 20 through May 18, 2008, then again from May 19 through July 17, 2008, and again from July 18 through September 15, 2008. Although Koroma certified Patient SM for home health services beginning on March 20, 2008, her file indicates that her first visit with Koroma was on March 27, 2008, a week after he initially certified her. The file also contains notes from a physical on April 28, 2008, which read, "No hospital/ER visits. No new medical problems. No change in current medical problems." Trial Tr. Vol. 2 278:6-7. Reports from physicals conducted on May 28, 2008, July 14, 2008, August 13, 2008, and September 13, 2008 contain the same notations, indicating no change in Patient SM's medical condition. After a period without home health services, from September 16 through October 9, 2008, Koroma recertified Patient SM from October 10 through December 8, 2008; Koroma did not visit the patient in the period before he recertified her for home health services. His next visit with Patient SM was on October 16, 2008, where he again noted, "No hospital/ER visits. No new medical problems. No change in current medical problems." *Id.* 282:8-9. Koroma made the same notations of no change in her medical condition at the November 10, 2008, and December 3, 2008 appointments. This cycle—a period without certification followed by Koroma's recertification for home health services despite his notations of no change in her medical condition—repeated itself six times between December 2008 and December 2012. *See id.* 282:23–308:24. Indeed, Koroma signed numerous orders discharging Patient SM, indicating "goals met," but then later recertified her for home health services, all the while indicating no change in her medical condition. *See id.* 285:19-20 (April 29, 2009 discharge), 290:16-17 (December 21, 2009 discharge), 294:17-18 (August 27, 2010 discharge), 298:1-2 (February 23,

2011 discharge), 302:2-3 (September 21, 2011 discharge), 302:10-11 (September 30, 2011 discharge), 304:25–305:1 (March 28, 2012 discharge).

The same pattern is evident in a number of Koroma's other patients. For Patient FP, notes from two visits in 2010 indicate that he had "No hospital/ER visits. No new medical problems. No change in current medical problems[,]" yet in between these two visits, Koroma certified Patient FP for in home health services. *See* Trial Tr. Vol. 3 336:17–337:8. As with Patient SM, Koroma discharged Patient FP, noting that the patient had achieved his goals. Later that same month, Koroma recertified Patient FP for home health services without seeing or examining the patient. Koroma repeated the pattern of discharge then recertification despite the notation of no change in the patient's medical condition five times between December 2010 and June 2013. *See id.* 336:4–344:12. The same pattern is evidenced in Patient JC's file (another patient charged in the indictment): Koroma discharged and recertified her for home health services twice between May 2012 and August 2013 despite notations indicating that her medical condition had not changed. *See id.* 344:21–350:8.

In addition to this evidence of Koroma's pattern of certifying patients for home health care regardless of whether he had examined them or noted any change in their medical condition that required home health care, the government presented testimony from a number of Koroma's patients as to their physical condition and ability to leave their homes during the period Koroma certified them for home health services. Patient FP testified that he has been visiting a doctor at a clinic every three to six months for the past eight to ten years. During the period when Koroma was making home visits, Patient FP or his wife would drive him to the clinic to visit his primary care doctor. Similarly, Patient SM testified that, during the period when Koroma was visiting her in her home, she would run personal errands, such as walking to the grocery store. She also

5

explained that at the beginning of that time period she would take the bus to the Woodlawn Clinic to visit her doctor, but that she stopped going to the clinic because she "didn't want the two to collide."[2] Trial Tr. 2 238:9-10. Dr. Swati Datta, Patient SM's primary care doctor, also testified and confirmed that she treated the patient at Woodlawn Health Center every three to four months in 2011 and 2012, which overlapped with the period in which Koroma had certified Patient SM as homebound and in need of in-home medical care. Patient JC testified that she cares for herself at home and that there is nothing she wants do that she is unable to leave her apartment to do. She explained that she used to visit a primary care doctor but stopped while the doctors were visiting her in her home, and that she currently has a primary care doctor she drives to visit approximately once per month. Patient IH testified along the same lines; during the period in which Koroma was visiting her at her home, she would leave her house daily to run personal errands. She also explained that she has been visiting her primary care doctor approximately every three months for the past five or six years.

On the Form 485s for each of these patients, Koroma signed a certification that the patient was confined to his or her home and in need of skilled nursing care. The form also included the warning, "Anyone who misrepresents, falsifies or conceals essential information required for payment of federal funds may be subject to fine, imprisonment or civil penalty under applicable federal laws." Trial Tr. Vol. 1 65:22–66:12, ECF No. 120. The government also presented the Medicare Enrollment Forms for Banio Koroma, on which he certified that he

---

[2] The defense called Special Agent Raul Sese, a Health and Human Services Agent tasked with investigating Medicare fraud, to rebut Patient SM's testimony. In notes from an interview with Patient SM, Agent Sese recorded that the patient stopped seeing her primary care doctor because "she was unable to stand and wait for long periods of time for her appointment." Trial Tr. Vol. 3 524:8-10. The notes also indicate, however, that Patient SM reported that she stopped seeing Dr. Datta "because she did not want to see both Datta and Koroma at the same time because she thought that might not be appropriate." *Id*. 524:25–525:1.

would abide by Medicare laws, regulations, and program instructions and that he had read the potential penalties for furnishing false or fraudulent information to the Medicare program. *See* Gov. Trial Ex. 5, 7; *see also* Trial Tr. Vol. 3 458-64.

Randall Fecho, a former branch manager for Mobile Doctors, testified about the significance of the Form 485s; he explained that home health nursing agencies prepared the forms for a doctor at Mobile Doctors to complete when they saw that particular patient. If Mobile Doctors did not return signed Form 485s to the home health agencies, it risked losing their business. Fecho testified that if a doctor refused to sign the form certifying a new patient for home health services, he would assign the patient to another doctor to be reevaluated. If a doctor refused to sign the form for a patient who had already been admitted and was up for recertification, Fecho would ask another doctor to review and sign the form. Fecho testified that every few months he took such forms to Koroma, explained that another doctor felt uncomfortable signing the forms, and would ask Koroma to sign them instead. Koroma responded that he "would want to be paid for doing it," and Fecho would pay him amounts ranging from $40 to $70 from petty cash to sign the forms. Trial Tr. Vol. 1 73:4.

Victoria Stange, a former clinical manager at Mobile Doctors, confirmed Fecho's testimony. She explained that she observed Mobile Doctors employees giving Form 485s to Koroma to sign when other doctors would not sign the forms and that she had given Koroma another doctor's Form 485s to sign when that doctor had fallen behind on his paperwork. Lisa Martin, a former clinical director, also testified that the standard practice at Mobile Doctors when a physician refused to sign a Form 485 was to give the form to Koroma to sign. From her observation, it was a "regular occurrence" for Koroma to sign the certification for another

7

doctor's patient without seeing the patient or reviewing the patient's chart. Trial Tr. Vol. 3 377:11–378:1.

Fecho also testified as to how doctors at Mobile Doctors were compensated: if they saw a patient but did not certify that patient as homebound, the doctor would not be compensated for the visit. Through Fecho, the government introduced payment records, and these records showed that Fecho wrote checks to Koroma for such reasons as, "Dr. Magdel refused to sign orders with a date on them when he was not working here. Then Dr. Koroma refused until I offered him cash[,]" (a $40 payment), and "Dr. Koroma's signature for Dr. Madgel's patients from Dr. Piegi's account, $100." Trial Tr. Vol. 1 79:19-21, 80:24-25. One payment had an accompanying email that read:

> Dr. Koroma has been invaluable in his willingness to sign orders and 485s for outgoing Dr. Hildreth and covering Dr. Schreder while she is out of town on two weeks vacation. I told him we would pay him for his services. He is the only doctor here willing to sign them. He has also been willing to sign various orders for various things which we could not get the primary doctor to sign for one reason or another, thereby making some of the home health nursing agencies happier. So I am requesting a check for Dr. Koroma for $100 for these services.

83:4-13; *see also* Gov. Ex. 71. Lisa Martin also testified to her participation in Mobile Doctors' bonus award calculations; she explained that Koroma received more bonuses than other doctors because "he was helping out the company by signing paperwork that otherwise may not have been signed at all or may not have been signed on time." Trial Tr. Vol. 3 385:8-10.

Koroma called one witness in defense, Maria Ortega, a certified medical assistant and former Mobile Doctors employee. Ortega accompanied Koroma on his home visits and described a typical day visiting patients with Koroma. She also described two incidents she witnessed where the manager of Mobile Doctors raised her voice to Koroma, telling him that she had been

8

chasing him for days to sign some documents, but that Koroma refused to sign the documents. Ortega had "no idea" what the documents were. Trial Tr. Vol. 4 572:5-10, ECF No. 123. Once Dike Ajiri, the owner of Mobile Doctors, asked Koroma to sign the documents, however, Koroma acquiesced and signed. On cross examination, the government reviewed the daily logs Ortega compiled for her patient visits with Koroma. Although Ortega denied previously telling government agents that "it was a rare event that every patient would be home when [she and Koroma] went out to see them," a number of her daily logs showed that she and Koroma did not see approximately a quarter of the patients scheduled those days because they were not home when she and Koroma attempted to visit. Trial Tr. Vol. 4 578:9-10.

After considering the evidence, the jury returned a verdict of guilty on all counts. Koroma has moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Rule 33.

## DISCUSSION

Koroma argues that the evidence presented to the jury was insufficient to support his convictions of health care fraud and of making a false statement in a health care matter. He faces a "'nearly insurmountable hurdle' in challenging the sufficiency of the evidence" to sustain his convictions. *United States v. Arthur*, 582 F.3d 713, 716 (7th Cir. 2009) (quoting *United States v. Woods,* 556 F.3d 616, 621 (7th Cir. 2009)). The court must be convinced that, "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found [him] guilty beyond a reasonable doubt." *Arthur*, 582 F.3d at 716 (citation omitted). In this inquiry, the court does "not weigh the evidence or second-guess the jury's credibility determinations." *United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). The court may grant a new trial "if there is a reasonable possibility that a trial error had a prejudicial effect upon

the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also* Fed. R. Crim. P. 33(a) (permitting new trial "if the interest of justice so requires").

For Koroma's health care fraud conviction to stand, the evidence must have been sufficient for a rational trier of fact to find beyond a reasonable doubt that: (1) there was a scheme to defraud a health care benefit program or to obtain the money or property owned by, or under the custody and control of any health care benefit program by means of material false statements, pretenses, representations, or promises in connection with the delivery or payment for health care benefits, items, or services; (2) Koroma knowingly and willfully executed the scheme; and (3) Koroma acted with the intent to defraud. *See* 18 U.S.C. § 1347; *see also* Jury Inst. 8, ECF No. 101. As to the false statement convictions, the evidence must have been sufficient for a rational trier of fact to find beyond a reasonable doubt that: (1) Koroma made or caused to be made a statement; (2) the statement was false, fictitious, or fraudulent; (3) the statement was material; (4) Koroma acted knowingly and willfully; (5) Koroma made the statement in a matter involving a health care benefit program; and (6) Koroma did so in connection with the delivery of or payment for health care benefits, items, or services. *See* 18 U.S.C. §§ 1001(a), 1035; *United States v. Natale*, 719 F.3d 719, 732-33 (7th Cir. 2013); *see also* Jury Inst. 9

In challenging the sufficiency of the evidence, Koroma focuses his arguments on the intent, willfulness, and scheme to defraud elements of the charged crimes. He argues that the government was required to provide expert testimony that the home health services were not medically necessary and that the patients were not "confined to the home," as that phrase is defined in the Medicare regulations. *See* Mem. in Supp. 3-4, ECF No. 131. The Seventh Circuit has not decided whether expert testimony is required to sustain convictions under 18 U.S.C.

§§ 1035 and 1347 for the provision of medically unnecessary treatment. *See United States v. Chhibber*, 741 F.3d 852, 859 (7th Cir. 2014) ("We need not decide as a matter of law whether expert testimony is required on the issue of medical necessity."). No matter; the determination of whether a "patient has the capacity to obtain healthcare provided outside rather than in the home," Trial Tr. Vol. 3 431:16-17, is not the equivalent of the determination that a specific medical procedure is medically necessary; the former can be adduced by lay witness testimony that the individual could leave his or her home to attend doctor appointments (as was the case here), whereas the latter requires specialized medical knowledge and judgment.[3] *See Chhibber*, 741 F.3d at 860-61 ("Deciding whether to credit simple factual testimony from these witnesses . . . required no expert testimony and was well within the province of the jury."); *cf. United States v. Pellmann*, 668 F.3d 918, 924-26 (7th Cir. 2012) (no expert testimony required to determine whether doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1)).

A number of Koroma's former patients testified that they were able to—and did—leave their homes to visit their primary care doctors during the time Koroma certified them as homebound and in need of home health services. This is in direct contradiction to the Manual's directive that homebound patients—those for whom Medicare will fund home health services— must not have the capacity to obtain healthcare provided outside their home. No expert testimony was necessary for the jury to make the common sense determination that patients who were

---

[3] The government argues that, if expert evidence is required, Dr. Datta offered "what could be considered expert testimony,"—*i.e.*, her opinion that Patient SM was not confined to her home or in need of home health services as of June 8, 2012, just five days before Koroma certified Patient SM for home health services. Resp. 9. As Koroma points out, however, Dr. Datta admitted she is not an expert in home health care and that she did not know the standard by which Medicare defines a patient as homebound. Reply 4, ECF No. 145 (citing Trial Tr. Vol. 2 221, 229).

visiting their primary care doctors had the capacity to obtain healthcare outside their homes and for the jury to infer that Koroma's certifications were, therefore, false or fraudulent.

Koroma's notations and actions, moreover, demonstrate that not even he believed that home health care services were medically necessary for a number of the patients he certified. The records for Patients SM, JC, and FP demonstrate that Koroma believed home health care services were not necessary for certain periods of time, as evidenced by his discharge notes or the failure to order home health care services.[4] That he then later certified each of these patients for home health care services after explicitly noting that they had no change in their medical conditions from the prior period (when he had indicated that the patient did not need services) is an indirect admission that the services were not medically necessary. The certification of patients for home health services that Koroma acknowledged they did not need evidences Koroma's intent to defraud Medicare. This is not an instance of a mistaken or inconsistent certification that happened on one or two occasions; rather, the evidence highlighted a pattern of knowing and willful conduct present across multiple patients and over the course of years.

Furthermore, the evidence showed that Koroma requested payment in exchange for his signature on Form 485s for patients he had not visited. Martin testified that she personally observed Koroma sign Form 485s that other doctors had refused to sign without Koroma having the patient chart in front of him or having seen the patient.[5] This demonstrates that Koroma

---

[4] Contrary to Koroma's assertions, the government did not argue and was not required to prove that any diagnoses submitted to Medicare were false. *See* Mem. in Supp. 3. The false statements at issue were Koroma's certifications on the Form 485s that Patients SM and JC were confined to their homes and in need of home health services. *See* Resp. 7-8.

[5] Koroma asserts that the testimony of Fecho and Stange undermined the government's argument that Koroma improperly signed charts for patients he had not seen. *See* Mem. in Supp. 3; *see also* Trial Tr. Vol. 1 92:4-6 (Fecho unable to confirm whether Koroma reviewed patient charts before signing Form 485s); Trial Tr. Vol. 2 264:16-23 (same as to Stange). Although these witnesses were unable to confirm whether Koroma signed Form 485s without reviewing patient

knowingly and willfully certified patients for home health services that he had not determined were "reasonable and necessary" based on the patient's condition at the time he ordered the services. Trial Tr. Vol. 3 440:5-10. He certified these patients without review despite having signed Medicare forms stating that he agreed to abide by Medicare rules and regulations, that he knew Medicare's payment of a claim was premised upon compliance with its regulations, and that he was aware of the penalties for submission of false or fraudulent statements to Medicare.

Koroma also asserts that the government failed to prove his involvement in a scheme. "A scheme to defraud a health care benefit program means a plan or course of action intended to deceive or cheat that health care benefit program and to obtain money and property of the health care benefit program." Jury Inst. 10. The pattern of discharging then recertifying patients, in the case of Patient SM six times over the course of five years, evinces a long-running course of action to obtain Medicare-funded services for patients for whom, by his own notations he admitted, home health care services were not reasonable and necessary. This, combined with the evidence of Koroma's financial interest in certifying patients and his requests for additional payments to sign certifications for patients he had not seen or for whom he had not reviewed the charts, demonstrates Koroma's participation in a scheme to defraud Medicare.

---

charts, Martin testified unequivocally that she observed this practice and that it was a regular occurrence with Koroma. Taking this evidence in a light most favorable to the government, while Fecho and Stange do not confirm Martin's testimony, they do not undermine Martin's testimony or the government's argument.

\* \* \*

When viewing the evidence in a light most favorable to the government, it is clear that a rational trier of fact could have found Koroma guilty beyond a reasonable doubt and that the jury had more than sufficient evidence upon which to do so. The motions for judgment of acquittal and for a new trial are, therefore, denied.

Dated: July 28, 2016

John J. Tharp, Jr.
United States District Judge